# United States Court of Appeals

## For the First Circuit

No.  04-2227

PROSPECT HILL ACQUISITION, LLC,

Plaintiff, Appellant,

v.

TYCO ELECTRONICS CORPORATION,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Joseph L. Tauro, U.S. District Judge]

Before

Boudin, Chief Judge,

Campbell, Senior Circuit Judge,

and Gertner,* U.S. District Judge.

Thomas N. O'Connor with whom Alan J. Langton II and Quigley, O'Connor and Carnathan LLC were on brief for appellant.

Ben T. Clements with whom Clements & Clements, LLP was on brief for appellee.

July 8, 2005

*Of the District of Massachusetts, sitting by designation.

**GERTNER**, **U.S. District Judge**.  This appeal arises from the district court's order granting summary judgment to Defendant-Appellee Tyco Electronics Corporation ("Tyco") and denying summary judgment to Plaintiff-Appellant Prospect Hill Acquisition, LLC ("Prospect Hill").  Prospect Hill brings this action against Tyco for occupancy charges arising from an alleged holdover tenancy.  The primary issue on appeal is the proper interpretation of the surrender clause contained in the Lease signed by the parties.  Finding no error, we affirm the district court's ruling.

## I.  Background

Prospect Hill is a Delaware limited liability company.  It was formed to own and operate a commercial building at 140 Fourth Avenue in Waltham, MA ("Premises").  Tyco is a Pennsylvania corporation that purchased the Premises in 1999 and sold it to Prospect Hill pursuant to a Purchase and Sale Agreement ("P&S") dated November 16, 2001.  The closing for the sale of the Premises took place on November 30, 2001, the same day that Prospect Hill leased the Premises back to Tyco pursuant to a written Lease.  The Lease term commenced on that date and expired on June 21, 2002.

The P&S provided for a "Due Diligence Period" prior to the closing, during which Prospect Hill was "to conduct [ ] surveys, reviews, analyses, and inspections of the environmental condition of the Premises."  The P&S contained no environmental warranties

-2-

and provided that Prospect Hill was purchasing the Premises "as is":

> Buyer acknowledges receipt of that certain inspection report dated September 11, 2001 by New England Inspection Service, Inc., and agrees that Buyer is acquiring the Premises strictly on an "as is", "where is" and "with all defects" basis and without representation, express, implied or statutory, of any kind, including, without limitation, representation or warranty as to title, condition (structural, mechanical, environmental or otherwise), construction, development, income, compliance with law, habitability, tenancies, merchantability, or fitness for any purpose, all of which are hereby disclaimed and which Buyer hereby waives; provided, however, that the Premises shall be in substantially the same condition that they are in as of the date of this Agreement, reasonable wear and tear and, subject to Article 13, damage by casualty and takings by eminent domain excepted. . . .

This provision is noteworthy because prior to the November 30, 2001 closing, Prospect Hill knew that metal plating operations -- which involved the regular use of hazardous materials, including cyanide compounds -- had been conducted on the Premises since 1975. On November 28, 2001, Prospect Hill's environmental consultant, Haley & Aldrich ("Haley"), provided an Oversight Expert Review of the Premises, in which it was advised that "[m]etal plating and machining have constituted a majority of the site manufacturing operations since the 1970s"; that cyanide was among the "industrial waste streams" generated at the site; and that "[m]anual plating is conducted in" an area of the building in which "recessed concrete floors are used to accommodate spilling from the plating operations." Tyco itself had conducted these operations on the

Premises since 1999, and Prospect Hill plainly understood that Tyco would continue its metal plating operations into the Lease term.

The Lease also contained a number of provisions that are worth reproducing in full. First, it contained a surrender clause at Art. XIV, § 1:

> At the expiration or prior termination of the Term of this Lease, except as hereinafter specifically provided, Tenant shall surrender the Demised Premises in the same condition as existed on the Commencement Date [of the Lease], reasonable wear and tear and damage by fire or other casualty excepted. Notwithstanding the foregoing, at the expiration or prior termination of the Term of this Lease, Tenant shall (i) remove its furniture and office equipment from the Demised Premises and its manufacturing equipment from that portion of the Demised Premises in which Tenant's manufacturing operations are currently located; (ii) steam clean floors, walls, and other exposed surfaces and dispose of residues in accordance with applicable law in the portion of the Demised Premises in which Tenant's wastewater treatment equipment and manufacturing operations are currently located; (iii) leave all remaining wiring in compliance with the National Electrical Code; and (iv) remove from the Demised Premises any and all equipment, ducts, fixtures, materials or other property that are or might be contaminated, hazardous and/or subject to regulation by any Environmental Laws; and Tenant shall repair any damage to the Demised Premises caused by such removal (but excluding the replacement of any ducts or items of a similar nature removed as aforesaid) to the extent the aggregate cost of such repair is reasonably estimated by Landlord to exceed $10,000.

Second, it contained a holdover tenant provision at Art. XXIV:

> If the Tenant remains in the Demised Premises beyond the expiration of this Lease . . . the Tenant shall be a tenant at sufferance only and shall pay during such period of holdover . . . an amount pro rated on a daily basis equal to three (3) times the Annual Base Rent . . . as of the expiration of the Term, plus any charges for additional rent hereunder, and Taxes and operating costs, if any, due for such period of holdover.

-4-

Third, it contained an integration clause at Art. XXV, § 6:

[The Lease] constitutes the entire and only agreement between the parties relating specifically to this matter and no oral statements or representations or prior written matters not contained in the Lease shall have any force and effect. No subsequent amendments, changes, or additions to the Lease shall be binding upon [Prospect Hill] or [Tyco] unless reduced to writing and duly executed by [Prospect Hill] and [Tyco]. . . .

Fourth, it contained an "as is" clause at Art. II, § 2:

[Tyco] acknowledges that [Tyco] owned and occupied the Building prior to the sale of the Building to [Prospect Hill] by [Tyco] on [November 30, 2001]. As a result, [Tyco] is thoroughly familiar with the condition of the Building and agrees that it is leasing the Demised Premises "as is", with all faults, with no representations or warranties by [Prospect Hill] . . . .

On March 29, 2002, three months before the end of the Lease term, Prospect Hill's property manager Spaulding & Slye Colliers ("Spaulding") sent a "yield-up" letter to Tyco "to clarify [Prospect Hill's] expectations of the surrender requirements as noted in the Lease." On April 12, 2002, Tyco responded in writing, outlining the procedures it would follow for the clean up of the Premises. Spaulding replied on May 13, 2002, requesting a number of additions to Tyco's plan. None concerned the concrete floor in the area of the building where the plating and wastewater treatment operations were located. On May 20, 2002, Haley requested that Tyco test for the presence of cyanide in that concrete floor. Tyco agreed, even though it believed that it was not required to do so under the Lease.

On June 18, 2002, Spaulding and Tyco representatives met to conduct a final inspection of the Premises. At that time, all Tyco personnel had vacated the area.[2] All Tyco equipment and property had been removed and Tyco had completed the steam cleaning of the floors required by Art. XIV, § 1(ii) of the Lease. Because Tyco believed that all of the work contemplated by the yield-up letter had been completed, it attempted to return the keys to the Premises to Spaulding. Spaulding refused to accept the keys until the issue of the concrete floor was resolved.

On July 8, 2002, Spaulding forwarded an invoice to Tyco for $156,000, representing the accrued occupancy charges pursuant to the holdover provisions in the Lease. On July 15, 2002, Tyco wrote to Prospect Hill regarding the concrete floor, insisting that it had complied with its obligation under the Lease to steam clean the floor and had also complied with Prospect Hill's request to test for cyanide. While these tests revealed cyanide traces in some areas of the concrete, Tyco indicated that it was not aware of any regulatory requirement that would oblige Prospect Hill to remove the concrete floor. However, it noted that "if in the future [Prospect Hill] were to demolish the building, the concrete that has cyanide residues would have to be treated as hazardous waste and disposed of according to state and federal regulations."

---

[2] In April 2002, Tyco ceased operating its plating business at the Premises and moved its operations to another Tyco facility in Norwood, MA.

On July 23, 2002, Prospect Hill made a written demand that Tyco remove the concrete floor from the Premises and further demanded that Tyco submit to Haley "the analytical data and proposed removal plan for review and approval" before beginning its work. Though it continued to maintain that it was under no obligation to do so, Tyco agreed to remove the concrete floor. On July 25, 2002, Tyco submitted a proposal for removal to Haley. On August 12, 2002, Haley and Prospect Hill approved Tyco's submission.

Before Tyco's environmental consultant could begin work, Prospect Hill was obliged to remove asbestos and lead-containing materials from the Premises, which both parties agreed was Prospect Hill's responsibility. Haley completed this work on September 13, 2002. Tyco's consultant began work on the next business day, September 16, 2002, and completed it on September 27, 2002. Tyco spent approximately $300,000 on the removal.

Based on its belief that Tyco did not fulfill its surrender obligations until October 1, 2002, Prospect Hill demanded that Tyco pay holdover rent charges for the period from June 21, 2002, through October 1, 2002, totaling $423,568.79 plus taxes and operating costs. When Tyco refused, Prospect Hill filed the instant complaint. The parties then filed cross-motions for summary judgment. On August 10, 2004, the district court issued an order and memorandum denying Prospect Hill's motion and granting

Tyco's.  See Prospect Hill Acquisition, LLC v. Tyco Electronics Corp., 328 F. Supp. 2d 179 (D. Mass. 2004).

## II.  Discussion

### A.  Standard of Review

The district court granted summary judgment based on its finding that the Lease was clear and unambiguous, a finding that we review de novo.  See McAdams v. Massachusetts Mut. Life Ins. Co., 391 F.3d 287, 298 (1st Cir. 2004) (standard of review for summary judgment is de novo); Principal Mut. Life Ins. Co. v. Racal-Datacom, Inc., 233 F.3d 1, 3 (1st Cir. 2000) (absent a situation where the factfinder has turned to extrinsic evidence to resolve a dispute about the contract's terms, contract interpretation is subject to de novo review).

### B.  Contract Interpretation

The parties agree that the interpretation of the Lease is governed by Massachusetts law.  McAdams, 391 F.3d at 298 n.5 (where parties in diversity case agree that Massachusetts law should apply to all claims, it is applied without further inquiry).  They further agree that its language is clear and unambiguous, obviating the need to consider extrinsic evidence.  See id. at 298.  They disagree, however, as to the meaning of that language and in particular, the Lease's surrender clause.

Prospect Hill's primary argument on appeal is that the district court erred in interpreting subsection (iv) of the Lease's

surrender clause to apply only to moveable materials and property. Under the district court's interpretation, subsection (iv) could not have applied to the concrete floor, and Tyco had no obligation to remove it. As the district court explained:

> Although the language of [subsection (iv)] does not expressly define or limit the types of "materials or other property" that Tyco had to remove from the facility if "contaminated, hazardous and/or subject to regulation," this court believes that the cyanide-contaminated floor did not constitute "materials or other property." The lease uses the phrase "materials or other property" in a context ("equipment, ducts, fixtures, materials or other property") that makes it clear that the phrase refers only to moveable materials and moveable property. Hence, real property, such as the facility's concrete floor, cannot constitute "materials or other property."

328 F. Supp. 2d at 184-85. And because Tyco had no obligation to remove the concrete floor, it did not breach the lease and become a holdover tenant. Id. at 185.

Prospect Hill argues that this construction of the contract's terms was in error. First, it contests the district court's reasoning that the phrase "equipment, ducts, fixtures, materials or other property" denotes moveable property. Fixtures are defined both by the Uniform Commercial Code and Black's Law Dictionary as immoveable. U.C.C. § 9-102(a)(41) ("'Fixtures' means goods that have become so related to particular real property that an interest in them arises under real property law."); Black's Law Dictionary 669 (8th ed. 1999) ("Personal property that is attached to land or a building and that is regarded as an irremovable part of the real

property, such as a fireplace built into a home.").[3]  Second, Prospect Hill asserts that the phrase "any and all . . . materials or other property" is sufficiently broad and all encompassing as to cover even the concrete floor.  Whatever the legal connotation of "fixtures," it argues, the plain meaning of this language buttresses its claim.  See 116 Commonwealth Condominium Trust v. Aetna Cas. & Surety Co., 433 Mass. 373, 376 (2001) (contract terms to be construed in their usual and ordinary sense).

Tyco responds that the district court correctly interpreted the contract's terms.  First, it contends that the surrender clause explicitly distinguishes between the materials or property to be removed at the expiration of the Lease on the one hand and the land and building on the other.  The surrender clause requires Tyco to "remove *from the Demised Premises* any and all . . . materials or other property. . . ." (emphasis added).  Art. I, § 1 defines the "Demised Premises" as the land "together with the building thereon . . . ."  Thus, the materials or other property to be removed are distinct from the land and building.  Second, Tyco asserts that the phrase "equipment, ducts, fixtures, materials or other property" connotes moveable objects, as the district court found.  As a practical matter, ducts and fixtures, like equipment and other moveable property and materials -- but unlike floors and walls --

---

[3] Prospect Hill notes that, had the parties wished to use a term denoting movability, they could have used the term "trade fixtures."  See Black's Law Dictionary at 669.

can be removed without altering the basic structure of the Premises itself.

Tyco has the stronger argument. In context, the phrase "equipment, ducts, fixtures, materials or other property" denotes moveable objects, notwithstanding Prospect Hill's arguments about the definition of the term "fixture." While fixtures may include equipment or objects that are attached to the building, such as machinery installed in place, it is unreasonable to extend the term to cover components of the structure itself. Tyco's contention that the term "Demised Premises" -- from which contaminated materials are to be removed -- includes both the land and the building is especially persuasive. We agree with the district court that the phrase "equipment, ducts, fixtures, materials or other property" should not be construed so broadly as to include the concrete floor. Because Tyco had no obligation to remove the concrete floor under the surrender clause, it was not in breach of the Lease and did not become a holdover tenant when it failed to remove the concrete floor prior to the expiration of the Lease.

We likewise reject Prospect Hill's argument that the cyanide itself, as distinct from the concrete floor, was "material" that Tyco was obligated to remove. First, this interpretation of the surrender clause is contrary to Prospect Hill's own course of conduct. Prospect Hill conceded that Tyco had no obligation to remove asbestos and lead -- both hazardous contaminants -- that

were embedded in various parts of the building. Second, Prospect Hill's argument is undermined by the plain language of the Lease. The surrender clause calls for the removal from the Demised Premises of any and all equipment, ducts, fixtures and "materials or other property that are or might be contaminated . . . ." The Lease thus distinguishes between the materials to be removed and the contaminants embedded in them.

Finally, it should be noted that if we were to accept Prospect Hill's argument, Tyco would be held liable for contamination that accrued over the course of nearly three decades, including that which occurred before its ownership of the Premises. The idea that Tyco -- Prospect Hill's tenant for a mere seven months -- should be held responsible for contamination caused over that period of time makes no sense.

Accordingly, we find that Tyco was not obligated by the terms of the Lease to remove the concrete floor from the Premises. And because Tyco had fulfilled its surrender obligations by the expiration of the Lease term, it was not a holdover tenant.[4]

---

[4] The fact that Tyco's environmental consultant was on the Premises until October 1, 2002, does not disturb that conclusion. Prospect Hill demanded that Tyco remove the concrete floor, though it had no authority to do so. Tyco acceded to that request at considerable expense, despite its belief that the demand was unreasonable. Tyco should not be penalized for its compliance.

### III.  Conclusion

Because we find that Tyco fulfilled its obligations under the Lease's surrender clause and was not a holdover tenant, the district court's order granting summary judgment to Tyco and denying summary judgment to Prospect Hill is

**Affirmed.**