THOMAS M. MACKSEY *vs.* WILLIAM P. EGAN & another.[1]

No. 92-P-1564.

Suffolk. December 13, 1993. - May 12, 1994.

Present: DREBEN, KAPLAN, & FINE, JJ.

*Contract*, Parties, Third-party beneficiary. *Corporation*, Tender offer. *Words*, "Best efforts."

A plaintiff in a civil action failed to demonstrate that he was an intended beneficiary of a corporation's reorganization agreement, to which he was not a party, whereby the corporation would have purchased from the plaintiff his shares in the corporation; the defendants' motion for judgment notwithstanding the verdict on the plaintiff's claim of breach of contract should have been allowed. [468-470]

In an action for breach of contract in which a corporation's reorganization agreement required the defendants to use their "best efforts" to carry out a tender offer (that later failed due to illegality), the defendants' motion for judgment notwithstanding the verdict should have been allowed where the plaintiff failed to show that the defendants breached the "best efforts" clause. [470-472]

CIVIL ACTION commenced in the Superior Court Department on November 6, 1989.

The case was tried before *John J. O'Brien*, J.

*Stephanie M. Williams* for the defendants.

*Glenn M. Shriberg* (*Stewart A. Engel* with him) for the plaintiff.

KAPLAN, J. The plaintiff Thomas Macksey met David Gilvar when they attended Stockholm University in 1966. In 1979 they decided to market a friend's invention, a portable display module for use at trade shows and exhibitions. Macksey, residing in Sweden, started and ran a company there, still in existence, that produced and sold the item. Gilvar started Extraversion, Inc., a Delaware company, with its

[1]Craig L. Burr.

principal place of business in Canton. Macksey was the beneficial owner of a significant percentage of the American company's shares[2]; he was designated a director but did not participate in the running of the business and never attended a meeting of the board.

Extraversion was a single-employee company in 1979. By 1986 it had offices in seven States and sales of $11 million, but profitability had been lost, and it found itself in default to Old Stone Bank in Providence, Rhode Island, on a $1.5 million loan.

With the thought that the company needed additional capital, the bank in late 1985 referred Gilvar to a financial consultant, Peter Pelletier. After some study of the situation, Pelletier got in touch with the defendants, William Egan and Craig Burr, general partners of Burr, Egan, Deleage, a venture capital investment firm. At this time, about March-April, 1986, Extraversion's internal, unaudited records showed (very mistakenly, as it later turned out) that the company was commencing to turn a profit. Egan and Burr were willing to invest on certain conditions.[3]

In April, 1986, Gilvar told Macksey of Egan and Burr's interest and also said, in line with the investors' plan to have the company buy out inactive shareholders, that Macksey would be asked to tender his shares to the company and resign as director. Macksey was willing to comply. As time approached for the investment, Burr had Gilvar send a letter to Macksey for his signature, giving assurance of his intention to sell his shares. Macksey signed.

A formal "Investors Agreement" was executed on May 29, 1986. The signers were Craig Burr and William Egan, as "Investors" (Pelletier was also named); David Shepard Burr (no relation to Craig Burr), on behalf of Extraversion; and Gilvar and David Shepard Burr as "Founders."[4] Macksey

---

[2] The shares were held in the name of Macksey's sister.

[3] The actions of Egan and Burr in all that followed were as individuals and not as members of the investment firm.

[4] David Shepherd Burr was an early investor in Extraversion, was a director at the time of the agreement, and was listed as its president.

was present at the closing but not a signer. Important points of the agreement were the following. The bank would be lending Extraversion $690,000, for which Egan and Burr would furnish cash collateral in the same amount. The company would make a tender offer, funded by an additional bank loan for which Egan and Burr would furnish full cash collateral; it was expected to bring in the shares of various inactive shareholders, including chiefly Macksey. Egan and Burr were to acquire a sixty percent controlling interest in the company: this contemplated their purchasing new shares, as detailed below. Pelletier would be installed as president and chief operating officer of the company.

Regarding the tender offer: The total of common shares outstanding was 3,132,500. David Shepard Burr and Gilvar each held 860,000; it was agreed that they would retain their shares. That left 1,412,500 shares (Macksey's included) as the objects of the tender offer. The terms of the offer were twelve cents per share payable in cash, and an additional eighteen cents payable under a three-year promissory note. Thus the amount of the bank loan to the company required to cover the cash offer (and the corresponding amount of the cash collateral) was figured at up to $169,500. The Agreement included a provision that Egan and Burr would use their "best efforts to cause the Company to carry out the tender offer."[5]

Regarding the purchase by Egan and Burr of additional shares: They were to purchase 4,732,500 shares (or such number as would equal sixty percent of all outstanding shares) of new preferred stock at one-tenth of a cent per share. These shares had full voting rights and formed the apparent basis for Egan and Burr's control of the company.[6]

---

[5] The text read thus: "*Investors to Cooperate in Tender Offer.* Each of the Investors agrees to use its best efforts to cause the Company to carry out the tender offer . . . but not to tender any of their stock in the Company in such tender offer."

[6] Egan and Burr were also to pay $10,000 for warrants representing options to purchase a like number of shares of common stock at a price of thirty cents a share, the options to be exercisable over a period of ten

We need mention certain of the sequelae of the Agreement. In June, 1986, Old Stone Bank made the $690,000 loan to Extraversion; Egan and Burr put up the cash collateral. On July 29, 1986, Extraversion made the tender offer specified in the Agreement. In mid-August Macksey tendered his shares; he had resigned his directorship when the Agreement was executed. In September, however, the company had to extend the tender offer through October 8, as the original offer by inadvertence had not been sent to some of the shareholders. On October 15, Extraversion's directors decided formally to accept Macksey's tender. No action was taken at that time to obtain the further loan from the bank to fund the purchase of tendered shares.

Sometime in September or October (the record does not indicate the exact date), Mr. Richard Kelly, counsel to Extraversion, informed the company that it was precluded by Delaware law from going through with the tender offer. This was because a Delaware corporation may not purchase its own shares when its capital is impaired.[7] See Del. Code Ann., tit. 8, § 160(a)(1)(1991); *Alcott* v. *Hyman,* 208 A.2d 501 (Del. 1965). See also *Ashman* v. *Miller,* 101 F.2d 85, 90 (6th Cir. 1939); *In re Receivership of Intl. Radiator Co.,* 10 Del. Ch. 358, 359-360 (1914). Kelly testified that he came to the conclusion that the purchase would be illegal after he received information that the company had incurred a substantial operating loss that eliminated any surplus the company might have had. The opinion was passed on to the company's officials at a directors' meeting in October or November. The aborting of the tender offer was notified officially to the shareholders by a company letter of February 3, 1987, stating that Macksey was not being paid because of the barrier of the impairment of capital.

Extraversion never regained a profit. It evidently defaulted on the bank loan, and, according to the testimony, Egan and

---

years. Although the record evidence is scant, it appears that the warrants were not exercised.

[7]Craig Burr testified that he did not know of this prohibition when he signed the Agreement.

Burr lost the $690,000 they put in as collateral. The company filed for reorganization under chapter 11 of the Bankruptcy Act in July, 1989, and went into liquidation under chapter 7 in September, 1990.

Macksey commenced the present action against Egan and Burr on November 6, 1989, with a complaint charging violations of G. L. c. 93A, deceit, and breach of contract. The c. 93A and deceit counts failed on the defendants' motions for dismissal and summary judgment. The court denied a defendants' motion for summary judgment on the contract counts, and the case went to trial on that phase only.[8]

It was accepted that the tender offer failed by reason of illegality.[9] Macksey contended, nevertheless, that the defendants were in breach of the "best efforts" provision in the Agreement regarding the tender offer. The trial judge put to the jury a special question as to each defendant: "Did defendant [name] breach the Investment Agreement by failing to use his best efforts to cause Extraversion to carry out the Tender Offer?" The amount of the damages, if any, was agreed: $103,200 in principal, representing the cash Macksey would have received as initial payment for his shares.

The judge denied the defendants' motions for a directed verdict at the close of the plaintiff's case and at the close of all the evidence. Verdicts "yes" were returned by the jury. The defendants moved for judgment n.o.v.[10] They contended then, as they do now on appeal, that upon the record, *first*,

---

[8]On this appeal, the defendants contend that the judge erred in denying their motions for summary judgment to dismiss the contract counts, but it is settled that this may not be reviewed after trial of those counts on the merits. See *Deerskin Trading Post, Inc.* v. *Spencer Press, Inc.*, 398 Mass. 118, 126 (1986); *American Country Ins. Co.* v. *Bernhard Woodwork, Ltd.*, 412 Mass. 734, 739-740 (1992).

[9]In the tender offer of July 29, near the end of the section entitled "Terms of the Offer," there was a paragraph that read: "All questions of the validity, form, eligibility and acceptance of any tender of shares will be determined by the Company, which determination will be final and binding. The Company reserves the right to reject any tenders not in appropriate form or the acceptance of or payment for which would, in the opinion of counsel to the Company, be unlawful."

[10]They did not move in the alternative for a new trial.

the plaintiff, not a party to the Agreement, failed entirely to show that he was an "intended beneficiary" of the Agreement with a right to sue upon it[11]; *second*, assuming a right to sue, the plaintiff failed entirely to show a breach of the "best efforts" provision. On either ground, the defendants contended, they were entitled to judgment. We agree with the defendants on both grounds.

*Third-party beneficiary.* The usual assumption, it is said, is that contracting parties "bargain and agree for themselves and only incidentally for third persons." *F.W. Hempel & Co.* v. *Metal World, Inc.*, 721 F.2d 610, 614 (7th Cir. 1983). According to Restatement (Second) of Contracts § 302 (1979), reproduced in the margin[12] — a formulation followed by our courts, see *Choate, Hall & Stewart* v. *SCA Servs.*, 378 Mass. 535, 546-548 (1979); *Rae* v. *Air-Speed, Inc.*, 386 Mass. 187, 194-195 (1982); *Public Serv. Co. of N.H.* v. *Hudson Light & Power Dept.*, 938 F.2d 338, 341 (1st Cir. 1991) — the assumption is overcome and a third person attains standing to sue on a promise as an "intended beneficiary" when this is "appropriate to effectuate the intention of the parties" and "the circumstances indicate that the promisee intends to give the beneficiary [third person] the benefit of the promised performance" (quoting from § 302[1][b]).

---

[11]Egan and Burr had requested a jury instruction on the question of intended beneficiary in accordance with *Rae* v. *Air-Speed, Inc.*, 386 Mass. 187, 194-195 (1982) (tracking the Restatement [Second] of Contracts § 302). Instead, over objection, the judge instructed the jury that Macksey was entitled to sue. For the reasons given below, we think the judge's instruction was mistaken and that he should indeed have directed a verdict in favor of the defendants on this issue.

[12]"§ 302. Intended and Incidental Beneficiaries.

"(1) Unless otherwise agreed between promisor and promisee, a beneficiary of a promise is an intended beneficiary if recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and either

"(a) the performance of the promise will satisfy an obligation of the promisee to pay money to the beneficiary; or

"(b) the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance.

"(2) An incidental beneficiary is a beneficiary who is not an intended beneficiary."

We find no evidence in the record that Extraversion or Egan and Burr had as their objective any benefit to Macksey; rather they were bargaining in their own interests to accomplish a planned reorganization: to secure a new loan for the company, to get inactive shareholders out of the way, and to put the control of the company in the hands of the fresh investors. It is true that effecting the reorganization would result in Macksey and any other tendering shareholders selling their shares and receiving the price, but this was incidental to the parties' design and rendered Macksey an "incidental beneficiary" under § 302(2), without standing to sue.

We are to distinguish situations where benefiting a third person is the intended purpose of one or both contracting parties, and situations where the benefiting is merely a means to the fulfilment of the parties' purpose or a foreseeable consequence of the fulfilment. (A city contracts with a construction company to build a road: an increase in the value of adjoining land is a foreseeable consequence of the agreement, a taking by eminent domain a means to its accomplishment.) See *Spinner* v. *Nutt*, 417 Mass. 549, 555-556 (1994); *United States for the Use of Valders Stone & Marble, Inc.* v. *C-Way Constr. Co.*, 909 F.2d 259, 265 (7th Cir. 1990). Compare *Brooks* v. *Land Drilling Co.*, 564 F. Supp. 1518, 1520 (D. Colo. 1983), and *In re Gulf Oil/Cities Serv. Tender Offer Litigation*, 725 F. Supp. 712, 733 (S.D.N.Y. 1989), suggesting that in particular situations shareholders might not be regarded as intended beneficiaries of a merger agreement.[13]

---

[13]Pointing to the inherent difficulties in using the concept of "intention" as Restatement (Second) attempts to do, Professor Melvin A. Eisenberg reexamines the field and recommends in a stimulating article that third-party beneficiary law be formulated as follows. A beneficiary should be empowered to enforce a contract only if "(I) allowing the beneficiary to enforce the contract is a necessary or important means of effectuating the contracting parties' performance objectives, as manifested in the contract read in the light of surrounding circumstances; or (II) allowing the beneficiary to enforce the contract is supported by reasons of policy or morality independent of contract law and would not conflict with the contracting parties' performance objectives." Under (I) would fall cases where the promisee has no economic incentive for enforcing the agreement or no ef-

Macksey is not helped by the cases he cites holding third persons to be intended beneficiaries: the contexts are very different from the present, and the intention to benefit is clearly shown. In *Rae* v. *Air-Speed, Inc.*, 386 Mass. at 193-196, the plaintiff's decedent was an employee claiming on an agreement between his employer and a carrier to obtain worker's compensation insurance for employees. The plaintiff in *Flattery* v. *Gregory*, 397 Mass. 143, 148-151 (1986), injured by negligent operation of a vehicle, could sue on a promise an insurance agent made (but failed to keep) to the driver that optional liability insurance coverage would be obtained. And in *Ayala* v. *Boston Hous. Authy.*, 404 Mass. 689, 699-703 (1989), tenants could enforce an agreement between the Boston Housing Authority and the United States Department of Housing and Urban Development under which BHA had agreed to inspect its housing for lead paint hazards.[14]

*Best efforts.* Egan and Burr were required under the Agreement to use their "best efforts to cause [Extraversion] to carry out the tender offer." The testimony showed that Egan and Burr made sure that all the necessary legal and other work was done, within a short deadline, to enable Ex-

fective remedy in case of breach. Among the reasons of policy or morality invoked by (II) are avoiding multiplicity of suit, avoiding unjust enrichment, and securing corrective justice. We suggest that Macksey would fare no better in this scheme. Eisenberg, Third Party Beneficiaries, 92 Colum. L. Rev. 1358, 1385 (1992).

[14]In another view of the case, § 302(1)(a) of the Restatement (Second) — "satisfy an obligation of the promisee to pay money to the beneficiary" — is of some interest. Illustration 3 reads: "B promises A to pay whatever debts A may incur in a certain undertaking. A incurs in the undertaking debts to C, D and E. If the promise is interpreted as a promise that B will pay C, D and E, they are intended beneficiaries under Subsection (1)(a); if the money is to be paid to A in order that he may be provided with money to pay C, D and E, they are at most incidental beneficiaries." In the sense that Egan and Burr agreed to see to the provision of funds to Extraversion with which the company was to carry out the tender offer, for "B" in the illustration we may read Egan and Burr; for "A" Extraversion; for "C" Macksey, and Macksey figures as at most an incidental beneficiary. (Illustration 3 appears also in *Choate, Hall & Stewart* v. *SCA Servs., Inc.*, 378 Mass. at 547 n.21. And see *Public Serv. Co. of N.H.* v. *Hudson Light & Power Dept.*, 938 F.2d at 343 n.12.)

traversion to issue the tender offer (and then to renew it). They did not take the further step of furnishing cash collateral to the bank for the loan to Extraversion with which the company would buy the tendered shares. At that point they knew, and it was the fact, that the purchase of the shares would be illegal: the agreed plan for a tender offer had collapsed.

Macksey argues that the "best efforts" obligation demanded that Egan and Burr take action quite distinct and apart from helping with a tender offer as agreed by means of a collateralized bank loan. Macksey suggests that Egan and Burr should have furnished sufficient funds to Extraversion to unimpair its capital and allow the purchase to go forward. It was estimated at the trial that in July, 1986, before Macksey's shares were tendered, this would have called for an infusion of nearly $600,000, and the figure rises to nearly $3 million by January, 1987. Macksey makes alternative suggestions about Egan and Burr restructuring their investment through paying off personally part of Extraversion's debt, or by themselves purchasing Macksey's shares.[15]

The judge instructed on "best efforts" as noted in the margin,[16] and Egan and Burr accepted the instruction without

---

[15]We pass over speculation and doubts whether one or another expedient would actually have cured the illegality under Delaware law.

[16]The judge instructed: " 'Best efforts' is what is reasonable in the circumstances. What constitutes best efforts may be determined by the parties' intentions. Best efforts does not require unreasonable, unwarranted or impractical efforts and expenditures of time and money out of all proportion to economic reality. Best efforts is equal to a good faith effort to meet one's obligations. The defendants are allowed to give reasonable consideration to their own interest. The defendants were required to do what was contemplated and what was reasonable under all of the circumstances, and to perform their activities with a good faith effort to the extent of their capabilities . . . . In construing the term 'best efforts,' you may consider the experience, expertise, financial status and other abilities of Mr. Egan and Mr. Burr."

The charge was a composite drawn from *Bloor* v. *Falstaff Brewing Corp.*, 601 F.2d 609, 613, 614 (2d Cir. 1979); *Perma Research & Dev. Co.* v. *Singer Co.*, 308 F. Supp. 743, 748-749 (S.D.N.Y. 1970); *NCNB Natl. Bank of N.C.* v. *Bridgewater Steam Power Co.*, 740 F. Supp. 1140, 1151-1152 (W.D.N.C. 1990); *Van Valkenburgh, Nooger & Neville, Inc.* v.

objection. There was no breach of the standard. For "best efforts" did not entail a duty to make an investment that would be significantly different in kind from that contemplated by the Agreement, involving additional outlay or alteration of the business risks.[17]

The cases Macksey cites do not read "best efforts" in a way that would import a material new promise into an express contract and then go on to find that promise violated; rather they assume a construction of "best efforts" in the natural sense of the words as requiring that the party put its muscles to work to perform with full energy and fairness the relevant express promises and reasonable implications therefrom. Such is the effect of *Western Geophysical Co.* v. *Bolt Assocs.*, 584 F.2d 1164, 1170-1171 (2d Cir. 1978); *Bloor* v. *Falstaff Brewing Corp.*, 601 F.2d 609, 613-615 (2d Cir. 1979); *Triple-A Baseball Club Assocs.* v. *Northeastern Baseball, Inc.*, 832 F.2d 214, 225-226 (1st Cir. 1987), cert. denied, 485 U.S. 935 (1988); *Polyglycoat Corp.* v. *C.P.C. Distrib., Inc.*, 534 F. Supp. 200, 203 (S.D.N.Y. 1982); *NCNB Natl. Bank of N.C.* v. *Bridgewater Steam Power Co.*, 740 F. Supp. 1140, 1151 (W.D.N.C. 1990).

To conclude, allowing all intendments in the plaintiff's favor,[18] we hold that he failed altogether to establish that he was an intended beneficiary entitled to sue or that the de-

---

*Hayden Publishing Co.*, 30 N.Y.2d 34, 45-46, cert. denied, 409 U.S. 875 (1972).

The only plausible suggestion that Macksey made for an addition to the charge spoke of "diligence" and would not have made any material change in the meaning.

[17]Macksey now tries to fault the investors for failing, after the legal death of the tender offer, to make a new form of investment that had in fact been rejected in the course of creating the Agreement. Thus there was testimony at trial that Egan and Burr had considered making a direct contribution to capital but had decided against it for a number of reasons, whose materiality Macksey appears not to question. See *Allied Communications Corp.* v. *Continental Cellular Corp.*, 821 F.2d 69, 72 (1st Cir. 1987) (applying Massachusetts law and interpreting a contract with a "best efforts" clause, the court refused to imply a promise — that the defendant would remain in business — which the parties had apparently considered but rejected in negotiating the agreement).

[18]We are sensible of the strict requirements for the allowance of a directed verdict or judgment n.o.v. See *Poirier* v. *Plymouth*, 374 Mass. 206, 212 (1978); *Dobos* v. *Driscoll*, 404 Mass. 634, 656, cert. denied sub nom. *Kehoe* v. *Dobos*, 493 U.S. 805 (1989).

fendants were in breach of the "best efforts" clause. Accordingly, the court erred in denying a direction.

The judgment appealed from is reversed, and judgment will enter for the defendants.

*So ordered.*