### ASYMMETRX, INC.

v.

### BIOCARE MEDICAL LLC.

### Civil Action No. 07–11189–RGS.

United States District Court,
D. Massachusetts.

Sept. 29, 2008.

---

Steven M. Bauer, Amy Crafts, Proskauer Rose LLP, Boston, MA, for AsymmetRx, Inc.

Douglas B. Otto, Jill K. Hauff, Morrison Mahoney LLP, Boston, MA, for Biocare Medical LLC.

## MEMORANDUM AND ORDER ON CROSS–MOTIONS FOR SUMMARY JUDGMENT

STEARNS, District Judge.

Plaintiff AsymmetRx, Inc., brought this patent action against defendant Biocare Medical LLC (Biocare) alleging infringement of an exclusive right to sell p63 antibodies in the commercial diagnostic market. The right is claimed under patents[1] assigned to AsymmetRx by the President and Fellows of Harvard College (Harvard). At issue is the interpretation of a competing License Agreement between Biocare and Harvard which allows Biocare to "make, use, and sell" the p63 antibodies. Biocare and AsymmetRx both move for summary judgment.[2]

### BACKGROUND

Harvard is the owner of the p63 antibodies and the '256 and '227 patents. In May of 2002, Biocare approached Harvard seeking to license the p63 antibodies for commercial and scientific uses. An agreement was eventually executed by Biocare's Eugene Castagnini[3] and Dr. Susanne Churchill, Harvard's Associate Dean for Research. The PREAMBLE of the License Agreement states that

[w]hereas HARVARD is owner by assignment from Drs. Frank McKeon[4] and Annie Yang of their entire right, title and interest in BIOLOGICAL MA-

---

1. The patents in dispute are United States Patent No. 6,946,256 (the '256 Patent), entitled "Cell Regulatory Genes, Encoded Products, And Uses Related Thereto," issued to Dr. Frank McKeon on September 20, 2005, and United States Patent No. 7,030,227 (the '227 Patent) entitled, "Cell Regulatory Genes, Encoded Products, And Uses Related Thereto," issued to Dr. McKeon on April 18, 2006. The '256 and '227 patents relate to p63–specific antibodies and methods for using p63 antibodies to detect malignant carcinoma.

2. The parties agree that the issues before the court involve matters of pure contract interpretation.

3. Castagnini is a co-founder of Biocare and its executive vice president, chief operating officer, and chief financial officer.

4. McKeon, a Harvard professor and named inventor on the '256 and '227 patents, is a cofounder of AsymmetRx.

TERIALS and KNOW–HOW as defined below; and

Whereas HARVARD is committed to [the] policy that ideas or creative works produced at HARVARD should be used for the greatest possible public benefit; and

Whereas Licensee is desirous of obtaining a non-exclusive world-wide license in order to use BIOLOGICAL MATERIALS and KNOW–HOW, and to develop, manufacture, use and sell in the commercial market the products made in accordance therewith;

&ast; &ast; &ast; &ast; &ast; &ast;

Article I, DEFINITIONS, states:

¶ 1.2— KNOW–HOW shall mean all information, methods, processes, techniques and data, whether or not patentable, which are disclosed to LICENSEE by HARVARD hereunder and which relate to BIOLOGICAL MATERIALS

¶ 1.8— FIELD shall mean the life science research market. Use in the human or animal diagnostic or therapeutic markets is specifically excluded from the FIELD.[5]

Article II, GRANT, states:

¶ 2.1— HARVARD hereby grants to LICENSEE and LICENSEE accepts, subject to the terms and conditions hereof a worldwide nonexclusive license to use BIOLOGICAL MATERIALS to research, develop, make and use HYBRIDOMAS and to make, use and sell LICENSED PRODUCTS.

¶ 2.5— The license granted by this Agreement does not include a license under any U.S. or foreign patents.

Article VI, TERMINATION OF AGREEMENT, states:

¶ 6.1— This Agreement shall commence as of the EFFECTIVE DATE and, unless extended (upon mutual written agreement of the PARTIES) or terminated in accordance with its terms, shall remain in effect as long as LICENSED PRODUCTS are sold.

In August of 2003, Harvard wrote to Biocare seeking to amend the License Agreement. Harvard explained that the language describing an unlimited right of use was a "clerical error" and that Biocare's license was intended to include a research use restriction. Biocare declined to ratify the proposed amendment. To date, Harvard has made no further demand, and the License Agreement as written remains in full force and effect.

In July of 2004, AsymmetRx entered into its agreement with Harvard. AsymmetRx received "an exclusive commercial license" under the '256 and '227 patents and "a license" to use the p63 antibodies (biological material). Prior to entering into the agreement, AsymmetRx reviewed all of Harvard's existing licenses (including Biocare's) relating to the p63 antibodies.

In November of 2004, Maria McKeon, President and General Counsel of AsymmetRx, wrote to Biocare demanding that it cease and desist all sales of the p63 antibodies in the diagnostic market, a market that McKeon insisted was covered by Harvard's grant of an "exclusive license" to AsymmetRx. Castagnini responded that Biocare's license with Harvard, which predated AsymmetRx's, placed no restrictions on the scope of Biocare's sales.[6] On June

---

**5.** FIELD is not referenced elsewhere in the Agreement.

**6.** Specifically, Castagnini wrote that Biocare

has spent excessive time, money and efforts in promoting the use of p63. We have been working with opinion leaders, research centers, labs, hospitals, universities, etc. across

27, 2007, AsymmetRx commenced this litigation.[7]

## DISCUSSION

A district court grants summary judgment only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56; *Santiago–Ramos v. Centennial P.R. Wireless Corp.*, 217 F.3d 46, 52 (1st Cir.2000). A party seeking summary judgment bears the initial burden of demonstrating that there is no genuine issue as to a material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The nonmovant in turn bears "the burden of producing specific facts sufficient to deflect the swing of the summary judgment scythe." *Mulvihill v. Top–Flite Golf Co.*, 335 F.3d 15, 19 (1st Cir.2003). "The mere existence of a scintilla of evidence is insufficient to defeat a properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Consequently, "a party opposing summary judgment must present definite, competent evidence to rebut the motion." *Torres v. E.I. Dupont De Nemours & Co.*, 219 F.3d 13, 18 (1st Cir.2000) (internal quotations and citations omitted).

 "[C]ontract law, unlike tort law, ... favors judicial resolution of disputes." *Nadherny v. Roseland Prop. Co., Inc.*, 390 F.3d 44, 48 (1st Cir.2004). "Whether or not a term as used by parties to a contract is ambiguous is a question of law.... However, where a term is ambiguous, its meaning presents a question of fact." *Compagnie de Reassurance D'Ile de France v. New England Reinsurance Corp.*, 57 F.3d 56, 75 (1st Cir.1995). "[T]he actual meaning of a contractual provision which can *reasonably* accommodate two or more interpretations should be left to the jury.... But the question whether a provision can reasonably support a proffered interpretation is a legal one, to be decided by the court." *Fleet Nat'l Bank v. Anchor Media Television, Inc.*, 45 F.3d 546, 556 (1st Cir.1995) (emphasis in original). "This is true even in 'close cases'; the jury does not become involved when words and context alone are used, but only when extrinsic evidence is at issue." *McAdams v. Mass. Mut. Life Ins. Co.*, 391 F.3d 287, 298 (1st Cir.2004). "Even if a contract might arguably appear ambiguous from its words alone, the decision remains with the judge if the alternative reading is inherently unreasonable when placed in context." *Id.* at 299.

AsymmetRx and Biocare agree (in the abstract) that Biocare's license is an unambiguous, integrated agreement. Predictably, however, the parties disagree over the interpretation of the agreement's material terms. AsymmetRx claims that Biocare's license is restricted to sales in the life sciences research market because: (1) the FIELD defined in the Definitions section of Article I:8 is so limited; and (2) the granting language of Biocare's license contains a "clerical error" omitting a reference to the definition of the FIELD. Bio-

---

the world. We have conducted seminars; collaborated with others in studies, articles and publications, etc. Our VP of R & D, Dr. David Tacha and his staff have actively promoted p63 and developed products to better improve patient testing. We would not have gone through this extensive expense and effort if we thought our license was for the research market only.

**7.** Four additional defendants, EMD Biosciences, Inc., Lab Vision Corp., Sigma Chemical Co., and Santa Cruz Biotechnology, Inc., have been dismissed from the lawsuit.

care for its part asserts that the term FIELD appears nowhere in Section 2.1, and that no intrinsic evidence supports the proposition that the scope of the grant was intended to be restricted by the limiting language of the Definition of FIELD.

Biocare additionally offers extrinsic evidence of its successful effort to negotiate the elimination of any reference to the definition of the FIELD in the grant language of Section 2.1. Until September of 2002, Dr. Henry Oettinger[8] represented Harvard in the negotiations with Biocare. Harvard's first draft of the license agreement included grant language limiting Biocare's use of the p63 antibodies to the "life science research market." Castagnini told Oettinger "that Biocare would not be interested in the license if it contained any such reference or limitation. Dr. Oettinger agreed to [the] removal of the field restriction under Section 2.1 of the license." Castagnini Aff. ¶ 6. After exchanging at least one additional draft, on October 15, 2002, Biocare and Harvard entered into the existing "Biological Materials License Agreement."[9]

■ First, some basic contract principles: "Parties are bound by the plain terms of their contract." *Hiller v. Submarine Signal Co.*, 325 Mass. 546, 550, 91 N.E.2d 667 (1950). " 'An ambiguity is not created merely because a controversy exists between parties, each favoring an interpretation contrary to the other.' Rather, '[i]t must be shown that reasonably intelligent persons would differ as to which one of two or more meanings is the proper one.' " *Wyner v. North Am. Specialty Ins. Co.*, 78 F.3d 752, 756 (1st Cir.1996), quoting *Jefferson Ins. Co. of New York v. Holyoke*, 23 Mass.App. 472, 474–475, 503

N.E.2d 474 (1987). *See also Coll v. PB Diagnostic Sys., Inc.*, 50 F.3d 1115, 1122 (1st Cir.1995) ("Language within a contract 'is usually considered ambiguous where an agreement's terms are inconsistent on their face or where the phraseology can support reasonable difference[s] of opinion as to the meaning of the words employed and obligations undertaken.' Where possible, words should be given their natural meaning, consistent with the tenor of contractual terms."); *Blakeley v. Pilgrim Packing Co.*, 4 Mass.App.Ct. 19, 24, 340 N.E.2d 511 (1976) (subjective reservations of a party are immaterial where an agreement is unambiguous).

■ When constricting contractual rights, "it is incumbent upon . . ., especially sophisticated part[ies], to make the limitation[s] clear." *In re Advanced Cellular Sys., Inc.*, 483 F.3d 7, 11 (1st Cir.2007), quoting *MBIA Ins. Corp. v. Royal Indem. Co.*, 426 F.3d 204, 218 (3d Cir.2005) (where sophisticated parties include broadly worded clauses in contracts, courts will likely assume that they "said what they meant and meant what they said."); *AccuSoft Corp. v. Palo*, 237 F.3d 31, 41 (1st Cir. 2001) ("We have also made clear that we do not consider it our place to 'rewrite contracts freely entered into between sophisticated business entities.' "), quoting *Mathewson Corp. v. Allied Marine Indus., Inc.*, 827 F.2d 850, 856 (1st Cir.1987). *See also Trans–Spec Truck Serv., Inc. v. Caterpillar Inc.*, 524 F.3d 315, 329 (1st Cir. 2008) (finding exculpatory language enforceable as parties were commercial entities experienced in product and contract negotiations); *Canal Elec. Co. v. Westinghouse Elec. Corp.*, 406 Mass. 369, 374, 548 N.E.2d 182 (1990) (court considered a con-

---

**8.** Dr. Oettinger was an official with the Harvard Medical School's Office of Technology Transfer & Industry Sponsored Research.

**9.** Biocare was one of several companies that entered into similar non-exclusive agreements with Harvard.

sequential damages disclaimer a "reasonable accommodation between two commercially sophisticated parties"); *Cheschi v. Boston Edison Co.*, 39 Mass.App.Ct. 133, 141, 654 N.E.2d 48 (1995) (finding Mass. Gen. Laws ch. 175, § 112, requiring insurers to show prejudice before refusing indemnification for late notice, inapplicable to two sophisticated businesses who negotiated an indemnification clause as part of a private contract).

█ This was an arms-length agreement between two commercially sophisticated parties. Biocare's license is unambiguous. The GRANT section of the agreement contains no limiting language. The term FIELD does not appear in any enabling section of the agreement. To read the definition of the FIELD, standing alone, as an operative element of the contract narrowing the rights and obligations of the parties in derogation of the broad rights conferred by the GRANT language would result in a hydra-headed instrument resembling nothing in accepted commercial usage. "Agreements, especially commercial arrangements, are designed to make sense. If one reading produces a plausible result for which parties might be expected to bargain, that reading has a strong presumption in its favor as against another

reading producing an unlikely result (*e.g.*, windfall gains, conditions that cannot be satisfied, dubious incentives)." *Nat'l Tax Inst., Inc. v. Topnotch at Stowe Resort & Spa*, 388 F.3d 15, 19 (1st Cir.2004).

█ The extrinsic evidence also supports Biocare's reading of the agreement. A contract need not be ambiguous on its face for extrinsic evidence to be considered. Extrinsic evidence bearing upon the background and purpose of the parties, as well as their understanding of particular language used in a contract, may be considered in resolving uncertainties in applying a contract's terms. *Robert Indus., Inc. v. Spence*, 362 Mass. 751, 754, 291 N.E.2d 407 (1973) ("When the written agreement, as applied to the subject matter, is in any respect uncertain or equivocal in meaning, all the circumstances of the parties leading to its execution may be shown for the purpose of elucidating, but not of contradicting or changing its terms."). *See also* Uniform Commercial Code, Mass. Gen. Laws ch. 106, § 2–202.[10] The court may "interpret even ambiguous contracts involving disputed extrinsic evidence where the evidence is so one-sided that no reasonable finder of fact could decide for the alternative interpretation." [11] *McAdams*, 391 F.3d at 298 n. 6.

---

**10.** "Terms with respect to which the confirmatory memoranda of the parties agree or which are otherwise set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement but may be explained or supplemented

 (a) by course of dealing or usage of trade (section 1–205) or by course of performance (section 2–208); and

 (b) by evidence of consistent additional terms unless the court finds the writing to have been intended also as a complete and exclusive statement of the terms of the agreement."

**11.** In descending order of importance extrinsic evidence may include: (1) the parties' negotiations; (2) their course of performance; (3) their prior course of dealing; (4) and trade usage in the relevant industry. *Den Norske Bank AS v. The First Nat'l Bank of Boston*, 75 F.3d 49, 52–53 (1st Cir.1996). "The modern approach ... allows extrinsic evidence to 'interpret' even a seemingly unambiguous contract, but not to vary or contradict its terms." *Fleet Nat'l Bank v. H & D Ent't, Inc.*, 96 F.3d 532, 539 (1st Cir.1996) (observing that Massachusetts tends to the "older view but not unequivocally so."). *But see Wyner*, 78 F.3d at 754 ("Summary judgment is normally unwarranted [in cases involving contractual ambiguity] unless extrinsic evidence presented

Biocare's initial email to Harvard proposed the purchase of a "non-exclusive licensing agreement for the commercial and scientific use of the clone and the rights for the sale and distribution of antibody products from the clone, with royalties." When Harvard offered a license restricted to the research market, Castagnini specifically asked Dr. Oettinger for the deletion of language incorporating the FIELD limitation because "80% of Biocare's sales are in the diagnostic market. A license limited to the research market only would do nothing for Biocare." Second Castagnini Aff. ¶ 7. Biocare and Harvard exchanged drafts over a four-month period addressing issues of unrestricted use and insurance before the agreement was executed (after a final review by Harvard Counsel's Office and Dr. Churchill, Harvard's Associate Dean for Research).

■ In asserting a scrivener's error, AsymmetRx in essence is asking the court to reform Biocare's contract with Harvard. A fundamental problem with the request lies in the fact that AsymmetRx is not a party to the contract. As a rule, only a party can sue to enforce a contract's rights and obligations. *See Macksey v. Egan*, 36 Mass.App.Ct. 463, 468, 633 N.E.2d 408 (1994). In rare circumstances, a court will permit an enforcement action by an intended third-party beneficiary of a contract.[12] *See Edelkind v. Fairmont Funding, Ltd.*, 539 F.Supp.2d 449, 453 (D.Mass.2008).[13] There is no plausible basis on which AsymmetRx can claim itself to be a third-party beneficiary under the Biocare–Harvard License Agreement.

### After–Acquired Patents

■ AsymmetRx next argues that Biocare's license agreement expressly excludes any rights covered by the '256 and '227 Patents. AsymmetRx relies on the language of ¶ 2.5 of the Agreement ("The license granted by this Agreement does not include a license under any U.S. or foreign patents."). Biocare counters that because the patents at issue were pending and not disclosed to Biocare, they cannot preclude Biocare's right to use the p63 antibodies. Alternatively, Biocare claims that it is entitled to an implied license for

---

about parties' intended meaning is so one-sided that no reasonable person could decide to contrary."); *Smart v. The Gillette Co. Long–Term Disability Plan*, 70 F.3d 173, 179 (1st Cir.1995) ("Courts sometimes may ponder extrinsic evidence to determine whether an apparently clear term is actually uncertain ... [b]ut this exception is narrow at best.").

12. Massachusetts has adopted § 302 of the *Restatement (Second) of Contracts* (1981), which provides:
 (1) Unless otherwise agreed between promisor and promisee, a beneficiary of a promise is an intended beneficiary if recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and either (a) the performance of the promise will satisfy an obligation of the promisee to pay money to the beneficiary; or (b) the circumstances indicate that the promisee intends to give the beneficiary

the benefit of the promised performance. (2) An incidental beneficiary is a beneficiary who is not an intended beneficiary.

13. Another obstacle is the MERGER clause of the License Agreement. Section 7.12 of the Agreement states that
 [t]his Agreement constitutes the entire understanding between the PARTIES and supersedes all prior agreements and understandings (oral or written) relating to the subject matter hereof. This Agreement may be amended, modified or altered only upon written agreement of both PARTIES. Neither party shall be obligated by any condition or representation other than those expressly stated herein or as may be subsequently agreed to by both PARTIES in writing.
 Harvard has not joined AsymmetRx's request to reform the contract.

the continued use of the biological materials.

 Rules of construction prefer the reading of a contract as a whole in interpreting a disputed term, rather than balkanizing its language. *Smart,* 70 F.3d at 179. When the relevant provisions of Biocare's License Agreement are read with this principle in mind, ¶ 2.5 cannot (as AsymmetRx posits) have reasonably been intended as defining a condition subsequent terminating the Agreement. Harvard granted Biocare the use of the biological materials, which "shall mean the materials and Know How." Know How is defined as "all information, methods, processes, techniques and data, *whether or not patentable,* which are disclosed to Licensee by Harvard." (Emphasis added). The License Agreement is (subject to Article VI) to "remain in effect as long as Licensed Products are sold." Article VI specifies "events" (other than the cessation of sales by Biocare) that would cause the agreement to terminate. The issuance of an after-acquired patent is not one of the specified events. The License Agreement does not reference the '256 or '227 patents (or any pending patent applications) or anywhere state that the license was intended to exclude the subject matter of patents issued "subsequent hereto" or "later-in-time." Finally, the '256 patent issued on September 20, 2005; the '227 patent issued on April 18, 2006. The issuance of the patents had no effect on the course of Biocare's and Harvard's dealings under the Agreement. Any reasonable reading of ¶ 2.5, informed by the Agreement as a whole (and particularly its termination provisions), makes clear that it was intended to exclude only those materials that were covered by patents in existence when Biocare received its license.

 Alternatively, Biocare asserts an implied license to use the patented materials. The existence of an implied license is a question of law for the court, and if found, operates as a complete defense to a claim of infringement. *Met–Coil Sys. Corp. v. Korners Unlimited, Inc.,* 803 F.2d 684, 687 (Fed.Cir.1986). *Id.* The formation of an implied license by equitable estoppel arises when: (1) a patentee misleads an alleged infringer (through action, inaction, or silence) to reasonably infer that it does not intend to enforce its patent; (2) that the alleged infringer relies on the patentee's conduct; and (3) the alleged infringer would be materially prejudiced if the patentee were allowed to proceed with a claim. *See Winbond Elec. Corp. v. Int'l Trade Comm'n,* 262 F.3d 1363, 1374 (Fed.Cir.2001).[14]

Biocare received its license from Harvard in October of 2002. Approximately one year later, in August of 2003, Harvard requested that Biocare execute an amendment restricting the license to the field of use identified in the DEFINITIONS section of the agreement. Biocare refused.

---

14. Biocare also argues that it is entitled to an implied license under the doctrine of legal estoppel. Formation of an implied license by legal estoppel arises when a licensor: (1) licenses or assigns a right; (2) receives consideration; and, (3) seeks to derogate from that right. *Winbond,* 262 F.3d at 1375. "The essence of legal estoppel that can be found in the estoppel of the implied license doctrine involves the fact that the licensor (or assignor) has licensed (or assigned) a definable property right for valuable consideration, and then has attempted to derogate or detract from that right. The grantor is estopped from taking back in any extent that for which he has already received consideration." *AMP Inc. v. U.S.,* 182 Ct.Cl. 86, 389 F.2d 448, 452 (1968) (finding it inequitable for a licensor to negate a licensed right by asserting against the licensee a later-acquired patent). Legal estoppel is not applicable here as Harvard has taken no steps to derogate or detract from Biocare's rights under the License Agreement.

Fifteen months later, in November of 2004, AsymmetRx demanded that Biocare cease and desist from sales of the p63 antibodies in the diagnostic market. Biocare again refused, stating that its license did not prohibit such sales. Biocare heard nothing further until AsymmetRx filed this Complaint for patent infringement in June of 2007. During the interim (and since) Harvard has accepted royalty payments from Biocare on all of its sales of the p63 antibodies, without objection, including sales in the diagnostic market. Biocare, under the circumstances, justifiably relied on Harvard's acquiescence in believing that it was acting within its rights under the License Agreement notwithstanding the after-acquired patents. *Cf. Wang Labs., Inc. v. Mitsubishi Elecs. Am., Inc.*, 103 F.3d 1571, 1580 (Fed.Cir.1997) (an implied license may arise "by acquiescence, by conduct, by equitable estoppel (estoppel in pais), or by legal estoppel.").[15]

### ORDER

For the foregoing reasons, AsymmetRx's Motion for Partial Summary Judgment is *DENIED* and Biocare's Motion for Summary Judgment is *ALLOWED*. Perforce, AsymmetRx's Motion for a Preliminary Injunction is *DENIED*. The Clerk will enter judgment for Biocare and close the case.

SO ORDERED.

---

15. While the court believes that its interpretation of the contract language is conclusive of the dispute, it finds, in the alternative, that Biocare has satisfied its burden of demonstrating an entitlement to an implied license under the '256 and '227 patents.