NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 09a0220n.06
Filed: March 23, 2009

**No. 08-3419**


**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

ELLIOTT COMPANY,

v.

LIBERTY MUTUAL INSURANCE
COMPANY,

  **Defendant-Appellant**

v.

| | |
|---|---|
| UNITED TECHNOLOGIES CORPORATION, | ON APPEAL FROM THE UNITED |
| | STATES DISTRICT COURT FOR THE |
|   **Third-Party Defendant-Appellee** | NORTHERN DISTRICT OF OHIO |

_____ /


**BEFORE:**  **MOORE, CLAY, and KETHLEDGE, Circuit Judges.**

  **CLAY, Circuit Judge**. Defendant Liberty Mutual Insurance Company ("Liberty Mutual")

appeals the judgment of the district court denying Liberty Mutual's motion for summary judgment

and granting summary judgment to Third-Party Defendants, the "UTC Companies," including

appellee, United Technologies Corporation ("UTC").[1]  On appeal, the parties dispute UTC's

---

[1]The "UTC Companies" include UTC, Carrier Corporation, CTU of Delaware, Inc., Hamilton Sundstrand Corporation, Homogeneous Metals, Inc., Otis Elevator Company, and Lear Corporation. We recognize that, although the district court's summary judgment order addressed the obligations of the UTC Companies, UTC is the only party before this Court on appeal. However, because the Agreement defines the obligations of "the UTC Companies," we will address UTC's obligation to

1

indemnification obligation pursuant to a 1994 settlement agreement between the UTC Companies and Liberty Mutual. In granting summary judgment to the UTC Companies and denying Liberty Mutual's motion for summary judgment, the district court concluded that the UTC Companies' indemnification obligation under Section 12 applied only to claims under policies that were exhausted or impaired by the Agreement. Because we conclude that UTC is not required to indemnify Liberty Mutual with respect to Elliott Company's claims, we affirm the decision of the district court.

I.    **BACKGROUND**

The dispute between UTC and Liberty Mutual on appeal stems from a lawsuit that Elliott Company ("Elliott") filed against Liberty Mutual seeking coverage under policies that Liberty Mutual issued to UTC and Carrier Corporation ("Carrier").

A.    **Factual Background**

In 1957, Elliott merged with Carrier and, in 1979, UTC acquired Carrier. In 1981, UTC incorporated Elliott as a subsidiary of UTC. UTC sold Elliott in 1987, and Elliott ceased to be affiliated with UTC. While Elliott was associated with Carrier, Liberty Mutual insured Carrier through policies effective between July 31, 1957 and January 1, 1963 (the "Carrier Policies"). Liberty Mutual also insured UTC under policies issued between 1981 and 1986 (the "UTC Policies") providing coverage for bodily and personal injury claims related to UTC's products. The policy issued to UTC in effect from 1985 to 1986 (the "1985-1986 Policy") provided coverage similar to prior policies, but contained a separate coverage limit for suits arising from non-product damages.

indemnify and defend Liberty Mutual with respect to Elliott's claims for coverage by interpreting the indemnification obligation of the "UTC Companies."

2

In 1987, UTC filed suit against Liberty Mutual, seeking a declaratory judgment regarding its rights to coverage under the UTC Policies for certain environmental claims filed against UTC. Carrier filed a similar suit against Liberty Mutual in 1988. Liberty Mutual filed a cross-complaint in the UTC action, seeking payment for insurance coverage allegedly owed to it by UTC. In December 1994, Liberty Mutual and the UTC Companies, including Carrier and UTC, entered into a Settlement Agreement (the "Agreement"), agreeing to dismiss their pending claims in the litigation and settle their dispute regarding the coverage obligations under the Carrier and UTC Policies. In Attachment "A" to the Agreement, the parties listed the insurance policies covered by the Agreement, and defined those policies as the "Subject Insurance Policies."

Regarding the disputed coverage under the policies issued by Liberty Mutual, Liberty Mutual agreed to pay the UTC Companies $24.9 million, and also waived its right to collect approximately $1 million that Liberty Mutual claimed the UTC Companies owed, as well as an estimated $10 million in premiums. The Agreement allocated a portion of the $35.9 million settlement value to impair or exhaust the aggregate limits of certain of the Subject Insurance Policies. In Attachment "B," the Agreement set forth the policies affected and the extent of their impairment.

In exchange for Liberty Mutual's payments to the UTC Companies pursuant to the Agreement, the UTC Companies released Liberty Mutual

> from any and all claims . . . which they now have, ever had or may have in the future, with respect to the Subject Insurance Policies arising out of, and on account of any past, present or future Environmental Claims, all claims asserted or which could have been asserted by the UTC Companies against Liberty [in the underlying litigation seeking declaratory relief], as well as any other policies that Liberty may have issued to UTC or its predecessors, successors, parents, affiliates and divisions, arising out of any past, present or future Environmental Claims, including any claims, or rights that the UTC Companies may possess or retain as a result of their former ownership of entitles that are no longer owned by the UTC Companies.

3

(J.A. 638.) In addition, with respect to the 1985-1986 Policy, the UTC Companies released Liberty Mutual "from any and all further claims for coverage under the $10 million aggregate limits of coverage for liabilities not related to . . . [liability for harm caused by the insured products] that are otherwise provided by [the relevant] Subject Insurance Policy. . . ." (J.A. 640.) The parties also agreed that the non-products $10 million limit was "fully satisfied and exhausted." (*Id.*)

The Agreement contains three provisions regarding the UTC Companies' obligations to defend and indemnify Liberty Mutual. Section 11 addresses claims against Liberty Mutual filed by other insurers of the UTC Companies. Specifically, the UTC Companies agreed to

> defend and indemnify Liberty with respect to any Action . . . by any other insurers of the UTC Companies . . . against Liberty alleging that Liberty should provide contribution or indemnity because of coverage that, absent this Agreement, allegedly may be owed to the UTC Companies under the Subject Insurance Policies for Environmental Claims.

(J.A. 642.) Similarly, Section 12 provided that the UTC Companies would indemnify and defend Liberty Mutual in actions by former subsidiaries of the UTC Companies:

> [T]he UTC Companies shall defend and indemnify Liberty with respect to any Action against Liberty by former subsidiaries of the UTC Companies alleging that Liberty should provide coverage that, absent this Agreement, may be owed to them solely under one or more of the Subject Insurance Policies for Environmental Claims. With respect to an Action that may be filed against Liberty by former subsidiaries of the UTC Companies alleging that Liberty should provide coverage for Environmental Claims that, absent this Agreement, may be owed to them under both the Subject Insurance Policies and that may be owed to them under other insurance policies issued by Liberty, the UTC Companies shall share responsibility for defense of such claims . . . .

(J.A. 643.) The parties also included an indemnification provision addressing claims filed by former UTC subsidiaries seeking liability coverage from Liberty Mutual under the 1985-1986 Policy for Pollution Claims[2] filed against the subsidiaries. Regarding such claims, the Agreement provides that

> the UTC Companies shall defend and indemnify Liberty with respect to any Action against Liberty by former subsidiaries of the UTC Companies alleging that Liberty should provide coverage for Pollution Claims under the 1985-1986 Policy. . . . . With respect to any action that may be filed against Liberty by former subsidiaries of the UTC Companies alleging that Liberty should provide coverage for Pollution Claims under the 1985-1986 Policy as well as under other policies issued by Liberty, the UTC Companies shall share responsibility for defense of such claims . . . .

(J.A. 14.) The parties further stipulated in the Agreement that "the UTC Companies' obligation to defend or indemnify Liberty pursuant to Sections 11, 12 and 13 is limited to the total amount of thirty million dollars." (J.A. 646.)

## B. Procedural Background

In April 2006, Elliott filed suit against Liberty Mutual in the Cuyahoga County Court of Common Pleas alleging entitlement to coverage for liability stemming from pending personal injury lawsuits against Elliott in which the plaintiffs sought damages for alleged exposure to asbestos. In its complaint against Liberty Mutual, Elliott alleged that, as the successor to the former Elliott Company Division of Carrier, it was entitled to liability coverage for the pending personal injury lawsuits under the Carrier and UTC Policies. After removing the case to the United States District Court for the Northern District of Ohio, Liberty Mutual filed a third-party complaint against the UTC

---

[2]The Agreement defines Pollution Claims as "Environmental Claims which do not constitute past, present and future liabilities, expenses and losses arising out of claims or actions filed or to be filed against the UTC Companies, by or on behalf of persons seeking damages for personal injury . . . alleged . . . to result from exposure to asbestos, chemicals or any other allegedly toxic . . . substances or products containing the same in whole or part. Pollution Claims also exclude asbestos property damage claims." (J.A. 644.)

5

Companies, claiming that, under Section 12 of the Agreement, the UTC Companies were jointly and severally liable to Liberty Mutual for all or part of Elliott's claims.

Liberty Mutual and Elliott filed cross-motions for summary judgment addressing the issue of whether Elliott was entitled to coverage under the UTC and Carrier Policies. Initially, the district court found that Liberty Mutual was entitled to summary judgment with respect to Elliott's claims under the Carrier Policies because Elliott's predecessor had not assigned Elliott the rights to coverage. However, Elliott moved for reconsideration, and the district court concluded that neither party was entitled to summary judgment with respect to Elliott's rights under the Carrier Policies. As to Elliott's claims for coverage under the UTC Policies, the district court found that the Agreement exhausted the policy limits of all of the insurance policies except for the 1985-1986 Policy. Accordingly, the only policies under which Elliott could seek liability coverage for its pending personal injury lawsuits were the Carrier Policies.

As a result, following the district court's ruling, Liberty Mutual and the UTC Companies filed cross-motions for summary judgment regarding the UTC Companies' indemnification obligation under Section 12 of the Agreement. In an opinion issued January 30, 2007, the district court agreed with the UTC Companies' position that the obligation to indemnify and defend Liberty Mutual under Section 12 was limited to "actions claiming that the Agreement improperly exhausted the policy limits," and did not extend to "all actions by former subsidiaries seeking coverage" under any policy. (J.A. 794.) Thus, the district court found that the UTC Companies were entitled to summary judgment declaring that the Agreement did not obligate the UTC Companies to indemnify and defend Liberty Mutual with respect to Elliott's claims brought under the Carrier Policies, because none of those policies were exhausted by the Agreement. On March 30, 2007, the district

6

court denied Liberty Mutual's motion for reconsideration, motion to direct the entry of a final judgment or to amend the judgment.

On February 20, 2008, the district court entered final judgment in the case. Liberty Mutual appealed, arguing that the district court erred in granting summary judgment to the UTC Companies on the issue of their indemnification obligation under Section 12 of the Agreement.[3]

## II. THE DISTRICT COURT PROPERLY CONCLUDED THAT UTC IS NOT REQUIRED TO INDEMNIFY LIBERTY MUTUAL WITH RESPECT TO ELLIOTT'S CLAIMS

### A. Standard of Review

This Court reviews *de novo* a district court's order granting a party's motion for summary judgment. *Cole v. ArvinMeritor, Inc.*, 549 F.3d 1046, 1070 (6th Cir. 2008). Summary judgment is proper if the evidence, taken in the light most favorable to the nonmoving party, shows that there are no genuine issues of material fact and that the moving party is entitled to a judgment as a matter of law. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); Fed. R. Civ. P. 56(c).

### B. Analysis

The parties agree that Massachusetts law governs the interpretation of the Agreement. Massachusetts courts interpret a settlement agreement pursuant to the same rules of construction that apply to contracts. *See Warner Ins. Co. v. Comm'r of Ins.*, 548 N.E.2d 188, 192 n.7 (Mass. 1990). Under Massachusetts law, the interpretation of a contract is a question of law, as is the question of whether a contract is ambiguous. *Alison H. v. Byard*, 163 F.3d 2, 6 (1st Cir. 1998) (applying

---

[3]Elliott is not a party to this appeal. After the district court's summary judgment ruling on Elliott's entitlements to coverage, Liberty Mutual and Elliott settled their dispute, and the district court dismissed Elliott's claims against Liberty Mutual.

Massachusetts law). As Massachusetts courts have made clear, "a contract that is free from ambiguity is to be interpreted according to its plain meaning." *Warren Freedenfeld Assoc., Inc. v. McTigue*, 531 F.3d 38, 49 (1st Cir. 2008) (applying Massachusetts law). In discerning the meaning of a contract, courts must look to the context of the contract, and cannot interpret the contract by "isolating words and interpreting them as though they stood alone." *Starr v. Fordham*, 648 N.E.2d 1261, 1269 (1995) (*cited in McAdams v. Mass. Mut. Life Ins. Co.*, 391 F.3d 287 (1st Cir. 2004)). Thus, contract interpretation under Massachusetts law "is largely an individualized process, with the conclusion in a particular case turning on the particular language used against the background of other indicia of the parties' intention." *Id.* This principle directs Massachusetts courts to "construe the contract with reference to the situation of the parties when they made it and to the objects sought to be accomplished." *Id.* (citation omitted).

In examining the language of the contract or agreement at issue, "every word and phrase . . . is if possible to be given meaning." *Mass. Ins. Insolvency Fund v. Premier Ins. Co. of Mass.*, 787 N.E.2d 550, 554 (Mass. 2003). Courts interpreting contracts under Massachusetts law also have recognized that, while extrinsic evidence generally is admissible only when a contract term is ambiguous, "a court may consider . . . extrinsic evidence for the very purpose of deciding whether the . . . contract is ambiguous." *Donoghue v. IBC USA (Publ'ns), Inc.*, 70 F.3d 206, 215 (1st Cir. 1995) (applying Massachusetts law).

The parties' dispute centers on Section 12 of the Agreement which states:

[T]he UTC Companies shall defend and indemnify Liberty with respect to any Action against Liberty by former subsidiaries of the UTC Companies alleging that Liberty should provide coverage that, absent this Agreement, may be owed to them solely under one or more of the Subject Insurance Policies for Environmental Claims. With respect to an Action that may be filed against Liberty by former subsidiaries of the

8

UTC Companies alleging that Liberty should provide coverage for Environmental Claims that, absent this Agreement, may be owed to them under both the Subject Insurance Policies and that may be owed to them under other insurance policies issued by Liberty, the UTC Companies shall share responsibility for defense of such claims . . . .

(J.A. 643.) The district court concluded that the indemnification obligation imposed by Section 12 did not apply in the context of Elliott's suit against Liberty Mutual. Agreeing with the interpretation that UTC advances on appeal, the district court concluded that the phrase "absent this Agreement" indicates that the indemnification obligation extends only to former subsidiaries' claims under policies that the Agreement exhausted or impaired—in other words, only to policies listed in Attachment B.

On appeal, Liberty Mutual challenges the district court's interpretation of Section 12 as inconsistent with the agreement as a whole. Liberty Mutual argues that Section 12 requires UTC to defend and indemnify Liberty Mutual with respect to Elliott's claims under the Carrier Policies. To support its argument, Liberty Mutual emphasizes the phrase "under one or more of the Subject Insurance Policies for Environmental Claims," and asserts that this phrase indicates that the UTC Companies' indemnification obligation extends to any suit filed by a former subsidiary seeking coverage under the Subject Insurance Policies—defined to include the Carrier Policies under which Elliott sought coverage.

In addition, Liberty Mutual argues that the district court misunderstood the meaning of the phrase, "absent this Agreement." Liberty Mutual maintains that the parties included that phrase to make clear that UTC's indemnification obligation extends only to suits under policies covered by the Agreement. (Appellant Br. 39) ("[I]ts purpose was to make clear that the indemnification obligation was as broad as, but no broader than, the original scope of coverage provided by the

9

'Subject Insurance Policies.'"). Liberty Mutual contends that this reading gives effect to both the phrase "absent this Agreement" and the term "Subject Insurance Policies" and, accordingly, is consistent with principles of contract interpretation under Massachusetts law.

Despite these arguments, we conclude that the district court correctly interpreted the scope of the UTC Companies' indemnification obligation pursuant to Section 12 of the Agreement. In the context of the entire Agreement and, in particular, the sections addressing the indemnification obligation of the UTC Companies, we find that Section 12 requires UTC to indemnify and defend Liberty Mutual only when a former subsidiary files a claim under a policy impacted in some way by the Agreement.

### 1.    Section 11 and Section 12

Sections 11 and 12 of the Agreement address the UTC Companies' indemnification obligation with respect to suits filed against Liberty Mutual. Under Section 11, the UTC Companies must indemnify Liberty Mutual when other insurers of the UTC Companies "alleg[e] that Liberty should provide contribution or indemnity because of coverage that, absent this Agreement, allegedly may be owed to the UTC Companies under the Subject Insurance Policies." (J.A. 642.) Similarly, Section 12 requires the UTC Companies to indemnify Liberty Mutual with respect to actions "by former subsidiaries of the UTC Companies alleging that Liberty should provide coverage that, absent this Agreement, may be owed to them solely under one or more of the Subject Insurance Policies." (J.A. 643.)

The district court determined that under Section 11, if the UTC Companies sought coverage from an insurer other than Liberty Mutual, and that insurer sought contribution from Liberty Mutual, the UTC Companies would be required to indemnify and defend Liberty Mutual. In reaching this

10

conclusion, the district court rejected the UTC Companies' argument that they are required to defend and indemnify Liberty Mutual only with respect to claims by other insurers under policies that were exhausted or impaired by the Agreement. Liberty Mutual does not disagree. Instead, it contends that the same reasoning that supported the district court's decision with respect to Section 11 should apply to the interpretation of Section 12. Specifically, Liberty Mutual asserts that the phrase "Subject Insurance Policies" must mean the same thing in both Sections 11 and 12 because "[i]f the parties had intended that the insurance policies subject to indemnification would be different depending on whether the claims for coverage were made by other insurers or former subsidiaries, they could have easily done so." (Appellant Br. 49.)

We agree with the district court. The Agreement explicitly releases Liberty Mutual from providing coverage to the UTC Companies under the Subject Insurance Policies for Environmental Claims. Thus, absent the Agreement, Liberty Mutual might have to provide coverage to the UTC Companies under the Subject Insurance Policies. Accordingly, Section 11 provides that, if a UTC Company insurer claims that Liberty Mutual should provide contribution because of its obligations to provide coverage to the UTC Companies under one of the Subject Insurance Policies, the UTC Companies will indemnify and defend Liberty Mutual. Thus, the Agreement's impact with respect to other insurers is to release Liberty Mutual from providing coverage to the UTC Companies under all of the Subject Insurance Policies.

In contrast, the Agreement does not affect Liberty Mutual's liability to former subsidiaries of the UTC Companies. In fact, in Section 17, the Agreement provides that it "does not reflect on the parties' views as to the rights and obligations with respect to matters or persons outside of the scope of this Agreement." (J.A. 646-47.) As Section 17 makes clear, the Agreement did not resolve

11

issues of coverage between former subsidiaries and Liberty Mutual. The only impact the Agreement has on former subsidiaries' claims is that, because the Agreement exhausts certain policies, former subsidiaries might have difficulty obtaining coverage if the Agreement exhausted or otherwise reduced the limit of the policy under which they seek coverage. Section 12 requires the UTC Companies to indemnify and defend Liberty Mutual with respect to suits by former subsidiaries alleging that Liberty Mutual should provide coverage that, absent the Agreement, might be owed to them under one of more of the Subject Insurance Policies. With respect to former subsidiaries, the only coverage owed "absent the Agreement" is coverage under exhausted or impaired policies.

Understanding Sections 11 and 12 in this manner, the term "Subject Insurance Policies" continues to mean all sixty-one policies listed in Attachment A. However, the term "absent this Agreement" modifies the types of claims for which the UTC Companies must indemnify and defend Liberty Mutual. Thus, as the district court concluded, because the Agreement impacted the claims of other insurers and former subsidiaries differently, the indemnification and defense obligations of the UTC Companies also are different.

In addition, as the district court noted, by reading the Agreement as Liberty Mutual proposes, the words "absent this Agreement" have no meaning, a result contrary to the preference under Massachusetts law to give meaning to all words in a contract. *See Mass. Ins. Insolvency Fund*, 787 N.E.2d at 554. The phrase "under the Subject Insurance Policies" makes clear that the indemnification obligation would extend only to claims made under those policies and, thus, using "absent this Agreement" to indicate the scope of the obligations would be redundant. This interpretation is further supported by the last part of Section 12, which provides:

12

[T]he UTC Companies shall indemnify Liberty as to any adjudication or reasonable settlement of such Action [filed by a former subsidiary seeking coverage that, absent this Agreement, may be owed to them under the Subject Insurance Policies and seeking coverage under other insurance policies issued by Liberty Mutual] only with respect to any amounts owed to said former UTC subsidiaries which are directly and solely attributable to the Subject Insurance Policies.

(J.A. 643.) Thus, even when discussing the possibility of amounts owed under policies outside of the sixty-one Subject Insurance Policies, the parties did not find it necessary to clarify the scope of the obligation by adding the phrase "absent this Agreement."

## 2. Section 13

Liberty Mutual also disputes the district court's interpretation of Section 13, which the district court relied on to aid its interpretation of Section 12. Section 13 provides that "[t]he UTC Companies shall defend and indemnify Liberty with respect to any Action against Liberty by former subsidiaries of the UTC Companies alleging that Liberty should provide coverage for Pollution Claims . . . under the 1985-1986 Policy." (J.A. 643-44.) Section 13 defines "Pollution Claims" as a subset of Environmental Claims, and excludes Environmental Claims that arise out of personal injury claims related to asbestos exposure.

The district court concluded that if Section 12 required the UTC Companies to indemnify and defend Liberty Mutual with respect to all claims filed by former subsidiaries seeking coverage under any of the Subject Insurance Policies, Section 13 would be superfluous. On appeal, Liberty Mutual argues that the district court "failed to appreciate that Section 13 provide[s] an exception to the general indemnity obligation" in Section 12. Specifically, Liberty Mutual contends that, "[a]s a result of Section 13, UTC's indemnification obligation with respect to claims under the 1985-1986 policy applied only to 'Pollution Claims' whereas the indemnity obligation in Section 12 otherwise

13

applied to 'Environmental Claims.'" (Appellant Br. 55.) According to Liberty Mutual's reading of Sections 12 and 13, Section 13 "subtracted" from the UTC Companies' indemnification obligation.

However, Section 12 makes no reference to Section 13. It does not state that the indemnification obligation of the UTC Companies set forth in Section 12 is "subject to" or otherwise affected by the obligations provided for in Section 13. In contrast, Section 12 makes clear that its terms are "[s]ubject to the terms of Section 14 herein." (J.A. 643.) If Section 13 in fact "subtracted from" the indemnification obligation of the UTC Companies set forth in Section 12, Section 12 likely would have referred to Section 13, as it referred to Section 14.

In addition, Section 13 demonstrates that requiring the UTC Companies to indemnify Liberty Mutual with respect to former subsidiaries' claims under exhausted policies is not, as Liberty Mutual argues, contrary to the parties' intent. Section 13 requires the UTC Companies to indemnify Liberty Mutual with respect to Pollution Claims under the 1985-1986 Policy. Pollution Claims are defined as Environmental Claims *other than* claims based on damages caused by products. (J.A. 644.) The 1985-1986 Policy contains a separate limit for non-products claims—the Non-Products Limit. This portion of the 1985-1986 Policy was exhausted under the terms of the Agreement. (J.A. 640.) Thus, to the extent that a former subsidiary's claim under the Non-Products Limit constitutes a Pollution Claim, the UTC Companies are required to indemnify Liberty Mutual pursuant to claims filed under an exhausted policy. That Section 13 also would require indemnification for claims filed pursuant to exhausted policies undermines Liberty Mutual's contention that it is "absurd" to read the phrase "absent this Agreement" in Section 12 to require the UTC Companies to indemnify Liberty Mutual only with respect to claims filed under exhausted or limited policies.

14

Also supporting the district court's interpretation of Section 12 is the fact that Section 13 does not use the phrase "absent this Agreement." As the district court pointed out, it would make "little sense that the Agreement would use 'absent this Agreement' to refer to coverage of former subsidiaries that was not impacted by the agreement while omitting this language to refer to exhausted policies." (J.A. 798.) Reading Sections 12 and 13 together supports the district court's interpretation that the Agreement does not require the UTC Companies to indemnify and defend Liberty Mutual with respect to Elliott's claims for coverage.

### 3. Other Arguments

On appeal, Liberty Mutual argues that numerous sections of the Agreement demonstrate that its interpretation of Section 12 is consistent with the Agreement as a whole.

#### a. *Attachment B*

First, Liberty Mutual maintains that, if the parties intended for the indemnification obligation to extend to claims by former subsidiaries only under impaired or otherwise impacted policies, the parties would have defined the UTC Companies' obligation by explicitly referring to Attachment B. Liberty Mutual contends that "[w]henever the parties actually intended to deal exclusively with the policies identified in Attachment B, they did so by making an explicit reference to that Attachment." (Appellant Br. 31-32.) As evidence, Liberty Mutual cites Sections 6, 8, and 24. Section 6 provides that

> any and all claims for such amounts which relate to the Environmental Claims are hereby forever released and discharged by Liberty and represent an impairment of aggregate limits (as shown on Attachment "B") greater than the settlement amount to be paid by Liberty as provided in Section 1A herein, in order to also reflect the amounts foregone by Liberty as provided in Section 1B herein.

15

(J.A. 11.) Similarly, Section 8 notes that "the various aggregate limits of one or more of the Subject Insurance Policies shall be impaired according to the schedule set forth on Attachment B." (J.A. 641.) Section 24 allows the parties to disclose the "impairment information on Attachment 'B' . . . if necessary." (J.A. 650.)

None of these sections support Liberty Mutual's contention. Sections 6, 8, and 24 do not use the term "Attachment B" as a way of defining obligations with respect to that group of policies. Sections 6 and 8 use the phrase "Attachment B" as a cross-reference to the impairment and exhaustion caused by the Agreement. Section 24 refers to Attachment B in the context of describing the information Attachment B provides regarding impairment of policies. Thus, contrary to Liberty Mutual's arguments, there is no indication that the parties would have referred to Attachment B in limiting or otherwise specifying the indemnification obligation of the UTC Companies.

b. *Monetary Cap on Indemnification Obligation*

Liberty Mutual also asserts that interpreting Section 12 to exclude claims such as that by Elliott in the present litigation from the UTC Companies' indemnification obligation is inconsistent with the $30 million cap on the UTC Companies' indemnification obligation set forth in Section 16. According to Liberty Mutual, the total remaining coverage under the policies exhausted or otherwise impacted by the Agreement is $6,543,482. Liberty Mutual argues that "there would have been no reason to set the limit at a figure more than $23 million higher than the total coverage remaining." (Appellant Br. 36.)

However, the $30 million cap on the UTC Companies' indemnification obligation set forth in Section 16 applies to the UTC Companies' indemnification obligations under Sections 11, 12, and 13—it is not limited to Section 12. Thus, even if the UTC Companies' indemnification obligation

16

under Section 12 could not exceed $6,453,482, the $30 million cap remains meaningful because the UTC Companies must indemnify Liberty Mutual in actions by other insurers seeking contribution, as well as in actions by former subsidiaries seeking coverage under certain limits of the 1985-1986 Policy.

c.    *Exception Terminology*

Liberty Mutual also argues that the district court erred in reading the phrase "absent this Agreement" as limiting the scope of the indemnification obligation because "[w]henever the parties actually intended to restrict the scope of UTC's indemnification obligation, they did so by adding specific, detailed provisions to clearly delineate what was excluded." (Appellant Br. 34.) To support its argument, Liberty Mutual asserts that the parties included entire provisions—Section 13 and Section 16—when they intended to make an exception to the UTC Companies' indemnification obligation.    However, as noted above, Section 13 does not provide an exception to the indemnification obligation set forth in Section 12.  Further, although it imposes a monetary limit on the UTC Companies' indemnification responsibilities,  Section 16 does not exclude types of claims from the scope of the UTC Companies' indemnification obligation.  Accordingly, neither provision provides support for Liberty Mutual's argument that the parties would have "carefully delineated" an exception to the UTC Companies' indemnification obligation.

4.    **Negotiation Evidence**

In addition to its argument that the Agreement unambiguously requires UTC to indemnify and defend Liberty Mutual with respect to Elliott's claims, Liberty Mutual argues in the alternative that the parties' negotiations support its interpretation of Section 12.  As in the district court, Liberty Mutual relies on the affidavits of several Liberty Mutual employees stating that Liberty Mutual

17

would not have agreed to a settlement that failed to provide indemnification for *all* coverage claims by former subsidiaries. Liberty Mutual also offers drafts of the Agreement to demonstrate that the parties did not negotiate the term "absent this Agreement."

Courts interpreting contracts under Massachusetts law have recognized that extrinsic evidence generally is admissible only when a contract term is ambiguous. *Donoghue*, 70 F.3d at 215. Because we find that the Agreement is not ambiguous regarding the indemnification obligation of the UTC Companies and that the meaning of Section 12 can be determined by examining the Agreement as a whole, we find that it is unnecessary to examine the extrinsic evidence Liberty Mutual offers in support of its interpretation of the Agreement.

## III.    UNSEALING OF BRIEFS AND APPENDICES

We note that, although the clerk's office of this Court granted the parties' motion to file their briefs and joint appendices under seal, the clerk's office inexplicably failed to submit the motion to the panel for consideration. After review, we conclude that the motion presents no legally sufficient reason for sealing the briefs and other documents, particularly in light of the "strong presumption in favor of public access to judicial proceedings" in considering a motion to seal court records, *see EEOC v. Nat'l Children's Ctr., Inc.*, 98 F.3d 1406, 1409 (5th Cir. 1996). Therefore, we order that the briefs on appeal be unsealed forthwith. Further, the appendices and documents filed under seal in the clerk's office are hereby ordered unsealed forthwith.

## IV.    CONCLUSION

We conclude that Section 12 of the Agreement does not require UTC to indemnify Liberty Mutual with respect to Elliott's claims for coverage under the Carrier Policies. Accordingly, we **AFFIRM** the judgment of the district court.

18

**KAREN NELSON MOORE, Circuit Judge**, dissenting. Because I believe that the contract language at issue in this case is ambiguous, I respectfully dissent.

This case turns largely on the following language in Section 12 of the Settlement Agreement between the Third-Party Defendants (collectively, the "UTC Companies") and Liberty Mutual Insurance Company ("Liberty Mutual"): "the UTC Companies shall defend and indemnify Liberty with respect to any Action against Liberty by former subsidiaries of the UTC Companies alleging that Liberty should provide coverage that, *absent this Agreement*, may be owed to them solely under one or more of the Subject Insurance Policies for Environmental Claims." J.A. at 643 (Settlement Agreement § 12) (emphasis added). The Agreement had the effect of exhausting or impairing a subset of these insurance policies. The question in this case is whether Section 12 requires the UTC Companies to indemnify and defend Liberty Mutual only when a subsidiary files a claim under a policy within this exhausted-or-impaired subset, *or* whether it requires the UTC companies to indemnify and defend Liberty Mutual when a former subsidiary files a claim under any applicable policy. I do not believe that the plain language of the Agreement can resolve this question.

Section 12 extends the indemnification obligation to former subsidiaries' claims for coverage that, "absent this Agreement," may be owed to former subsidiaries under the applicable policies. The ambiguity of Section 12 can be illustrated by considering slight variations on the operative language. On the one hand, this language may be construed as referring to coverage that, *without the impact of the Agreement*, might otherwise have been owed to former subsidiaries. That is, the indemnification obligation extends to former subsidiaries' claims for coverage only under the subset of policies that were actually impacted by the Agreement. As the majority puts it, the phrase "absent this agreement" modifies the types of claims to which the UTC Companies' indemnification

20

obligation extends so that "[w]ith respect to former subsidiaries, the only coverage owed 'absent the Agreement' is coverage under exhausted or impaired policies." Maj. Op. at 12.

But Section 12 is reasonably susceptible to another interpretation, which is urged by Liberty Mutual. It may also be read as referring to coverage that, *in the absence of or lacking the Agreement*, might have been owed to former subsidiaries. *See* RANDOM HOUSE UNABRIDGED DICTIONARY 7 (2d ed. 1993) (defining the preposition "absent" to mean "in the absence of" or "without"); *see id.* (defining "absence" to mean, among other things, "lack" or "deficiency"). If we assume that the Agreement is absent or does not exist, the "coverage" referred to in Section 12 must be the original scope of coverage that existed before the Agreement negatively impacted some of the policies. Under this reading, the indemnification obligation extends to former subsidiaries' claims for coverage under any of the applicable policies, not just the subset of policies exhausted or impaired by the Agreement. The majority contends that this reading would make the phrase "absent this Agreement" redundant because the phrase "under the Subject Insurance Policies" in Section 12 already "makes clear that the indemnification obligation would extend only to claims made under those policies." Maj. Op. at 12. As Liberty Mutual points out, however, the phrase "absent this Agreement" could have been intended to clarify that the indemnification obligation did not extend beyond the original scope of coverage provided by the insurance policies.

Because I believe that the meaning of the phrase "absent this Agreement" in Section 12 of the Agreement is ambiguous and because I do not believe that the Agreement's other provisions shed sufficient light to resolve this ambiguity, I would reverse the judgment of the district court and remand for consideration of extrinsic evidence.

21